AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original   ☐ Duplicate Original

LODGED
CLERK, U.S. DISTRICT COURT
7/27/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: ___ vav ___ DEPUTY

UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT
07/27/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: __KL__ DEPUTY

United States of America

v.

SABINO RAFAEL MUNOZ,
  aka "Silly Stalker"
  aka "Stalker,"
  aka "Stocker,"
  aka "Sillystocker,"

Defendant

Case No.    2:22-mj-02912-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.  On or about the date(s) of March 27, 2022, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g) | Felon in Possession of a Firearm |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Jonathon Kemp
Complainant's signature

Jonathon Kemp, ATF Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    July 27, 2022

Alicia G. Rosenberg
Judge's signature

City and state:    Los Angeles, California

Hon. Alicia G. Rosenberg, U.S. Magistrate Judge
Printed name and title

AUSA: Rachel N. Agress (x0487)

**AFFIDAVIT**

I, Jonathon Kemp, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint and arrest warrant against SABINO RAFAEL MUNOZ, also known as ("aka") "Silly Stalker," aka "Stalker," aka "Stocker," aka "Sillystocker," ("MUNOZ") for a violation of 18 U.S.C. § 922(g): Felon in Possession of a Firearm.

2.   This affidavit is also made in support of an application for a warrant to search the person of MUNOZ, as described more fully in Attachment A for evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 371 (Conspiracy), 922(g) (Felon in Possession of a Firearm and Ammunition), 1343 (Wire Fraud), 1344 (Bank Fraud), 1029 (Access Device Fraud) and 1704 (Mail Theft) (the "Subject Offenses") as described more fully in Attachment B.   Attachments A and B are incorporated herein by reference.

3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.   This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance

1

and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

## II. BACKGROUND OF AFFIANT

4.    I am a Special Agent ("SA") with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been so employed since September 2020.  I am currently assigned to the ATF Los Angeles Field Division, Long Beach Field Office.  As an ATF SA, I am charged with investigating violations of federal alcohol, tobacco, firearms, explosives, and arson laws and regulations.

5.    I am a graduate of the Federal Law Enforcement Training Center's Criminal Investigator Training Program.   I have also completed specialized training at the ATF National Academy regarding alcohol, tobacco, firearms, explosives, and arson.  Before joining ATF, I served an enlistment with the United States Marine Corps as an Infantry Assaultman where I routinely dealt and became familiar with firearms and explosives.  Following my enlistment, I earned a Bachelor of Arts in International Studies with a minor in Arabic from Texas A&M University, and a Masters of International Affairs from The Bush School of Government and Public Service at Texas A&M University.

## III. SUMMARY OF PROBABLE CAUSE

6.    On March 27, 2022, Los Angeles Police Department ("LAPD"), Harbor Division Gang Enforcement Detail ("HDGED") officers responded to a report of a shooting in the County of Los Angeles County, Central District of California by an

2

individual in a grey Chevrolet Camaro.  At the scene, LAPD found three 9mm spent casings.  Based on an alert, Torrance Police Department ("TPD") officers responded to the area of the shooting, identified a grey Camaro and attempted to conduct a traffic stop based on traffic violations.  The car failed to yield and TPD pursued the car for five minutes.  When the grey Camaro was finally stopped, MUNOZ, the owner, was found in the driver's seat, with an adult in the front passenger seat, and two passengers in the back seat, both of whom were minors.  TPD officers recovered a 9mm Ruger pistol from the front passenger seat loaded with one round of ammunition next to the center console, and a 9mm pistol bearing no serial number from the back passenger area behind the driver loaded with seven rounds of ammunition.

7.   In recorded post-arrest statements to one of the other passengers, MUNOZ references the "toys," which based on my training and experience, is street slang for firearms.

8.   MUNOZ has two prior felony convictions, and the Ruger pistol was manufactured outside the state of California.  A later analysis showed that the three recovered 9mm casings match the Ruger.

9.   Items recovered from a federal search warrant on February 17, 2022 at a residence in Compton included a bank card in the name of MUNOZ and envelopes of cash with MUNOZ's name on them.  Bank records show fraudulent checks being deposited into MUNOZ's account, with significant cash withdrawals and MUNOZ's name has been mentioned in coconspirator jail calls.  Based on

3

my training and experience and the evidence, there is probable cause that coconspirators provided MUNOZ with fraud proceeds in exchange for use of his bank account to deposit fraudulent checks.

## IV. STATEMENT OF PROBABLE CAUSE

10.   Based on my review of law enforcement reports, review of body worn camera and dashcamera footage, conversations with witnesses, my discussions with other law enforcement officers working on this investigation, and other evidence, and my own knowledge of the investigation, I am aware of the following:

### A.   Traffic Stop and Arrest of MUNOZ and Passengers

11.   On or about March 27, 2022, LAPD HDGED officers responded to a report of a shooting that had just taken place at 206th Street and Denker Avenue in the County of Los Angeles, Central District of California.   The report included a description of the suspect vehicle as a grey Chevrolet Camaro with an unknown license plate.   LAPD officers recovered three 9mm casings on 206th Street.   Based on the initial shooting report and the recovered casings, LAPD officers put out a radio broadcast of the incident, description of the grey Camaro and last known direction of the grey Camaro.

12.   TPD officers in a marked black and white police car heard the broadcast over their radio and responded to the area of the shooting.   TPD officers saw a grey Camaro which failed to signal when making a lane change in violation of California Vehicle Code Section 22107 and broken brake lights in violation of California Vehicle Code Section 24252(a)(1).   When the TPD

4

officers activated their lights and siren in an attempted to
conduct a traffic stop, the grey Camaro failed to yield.  TPD
officers conducted an approximately five-minute pursuit of the
grey Camaro which included speeding in residential
neighborhoods, failing to stop at stop signs, driving in
opposing lanes of traffic, running red lights and recklessly
driving around pedestrians.  Finally, the grey Camaro was boxed
in by law enforcement vehicles, nearly colliding with responding
units head-on.  While removing the passengers from the grey
Camaro, the officers observed a handgun on the passenger seat in
plain view.

13.  MUNOZ was the driver and registered owner of the grey
Camaro.  A twenty year-old individual, M.C., was seated in the
front passenger seat; a sixteen year-old, J.F., was seated in
the rear seat behind the driver's seat; and a twelve year-old
was seated in the rear seat behind the front passenger seat.
All four individuals were taken into custody.

14.  TPD officers searched the grey Camaro and recovered a
Ruger, Model LC9S, 9mm pistol bearing serial #452-66404, loaded
with one round of 9mm ammunition in the magazine, from the front
passenger seat, next to the center console.  A second firearm, a
polymer 80, model PF940C, 9mm pistol bearing no serial number,
wrapped in a blue bandana and loaded with seven rounds of 9mm
ammunition in the magazine was recovered from the rear passenger
seat behind the driver in the grey Camaro.

15.  While detained in the back seat of a police car with
J.F., one of the minor passengers, MUNOZ spoke with J.F. in

Spanish and this conversation was recorded by the car's
dashcamera.  Homeland Security Investigations Special Agent Juan
Orrantia, a native Spanish speaker, listened to the exchange and
provided an English translation of certain statements to me.
During the conversation, MUNOZ referenced the "toys," which
based on my training and experience, is street slang for
firearms.  During the conversation, MUNOZ told J.F. that if law
enforcement looked for it and found it, it was the minor's--
otherwise they were going to blame it on MUNOZ, because it's his
car.  Based on my training and experience and the context or the
conversation, I understand MUNOZ to have been referring to a
firearm.

16.  All four occupants of the vehicle were arrested for
violations of California Penal Code Section 246.3(a), Negligent
Discharge of a Firearm.

B.   **9mm Casings Match Recovered Ruger Firearm**

17.  Between on or about July 11, 2022 and concluding on or
about July 13, 2022, the Los Angeles County Sherriff's
Department Scientific Services Bureau examined the 9mm casings
recovered from the scene of the March 27, 2022 shooting and
compared them to the Ruger pistol recovered from the front seat
of the grey Camaro.  All three shells were positively identified
as having been fired in the Ruger pistol.

C.   **MUNOZ's Criminal History**

18.  I reviewed MUNOZ's certified conviction documents and
learned that MUNOZ has previously been convicted of the

following felony crimes punishable by a term of imprisonment exceeding one year:

a.   On or about October 24, 2001, a violation of California Vehicle Code Section 10851(A), Vehicle Theft, in the Superior Court of California, in the County of Los Angeles, Case Number NA050544.

b.   On or about July 19, 2007, a violation of California Penal Code Section 245(A)(1), Assault with a Deadly Weapon Not a Firearm, in the Superior Court of California, in the County of Los Angeles, Case Number NA074157.

**D.   Firearm's Interstate Nexus**

19.   On or about July 6, 2022, an ATF Interstate Nexus Expert examined the Ruger pistol seized from the grey Camaro and confirmed that the Ruger pistol was manufactured outside of the State of California.  Because the handgun was found in California, I believe that it has traveled in and affected interstate and/or foreign commerce.

**E.   Items Recovered from a Federal Search Warrant in Compton, Bank Records, and Statements by Coconspirators on Jail Calls, Evidence MUNOZ's Involvement in a Check Fraud Scheme**

20.   On or about February 16, 2022, the Honorable Paul Abrams authorized a search warrant for a residence in Compton, California (the "Residence") and accompanying vehicles, Case No. 22-mj-00634.

21.   On or about February 17, 2022, during execution of the search warrant on the Residence, law enforcement recovered among other things, large quantities of stolen U.S. Mail and checks,

USPS mail tubs and trays, debit cards not in the name of the
residents, approximately $10,000 in U.S. currency much of which
was contained in bank deposit envelopes, and twelve guns.

22.  Specifically, in a bedroom belonging to two
coconspirators ("CC-1" and "CC-2"), among other things, law
enforcement found six loaded handguns, a set of car key to a
GMC, approximately $7,150 in U.S. currency contained in Wells
Fargo deposit envelopes, and debit cards not in the names of the
residents, among other things.  Three of the Wells Fargo deposit
envelopes had the name "Sabino" handwritten on them.

23.  Inside of a black GMC pickup truck that was parked in
the driveway, law enforcement found approximately $3,750 in U.S.
currency contained in Wells Fargo deposit envelopes, bank
receipts, and debit cards not in the names of the residents,
among other things.  One of the Wells Fargo deposit envelopes
found in the GMC truck had the name "Sabino" handwritten on it
and one of the Wells Fargo debit cards ending in 2407 was in the
name of "Sabino R. Munoz."

24.  Wells Fargo records show that the debit card ending in
2407 is linked to a bank account ending in 1338 in the name of
"Sabino R. Munoz" ("MUNOZ's account").  MUNOZ can be seen on ATM
footage using his account on January 10, 2022.

25.  On or about January 20, 2022, a check in the amount of
$46,804.95 from a victim company S.K.L. made out to a victim
company R.R.L. was fraudulently deposited into MUNOZ's account
via ATM.  Between January 21, 2022 and February 1, 2022,
multiple withdrawals totaling $35,000 were made in denominations

usually ranging between $1,000 and $2,500 from various ATMS in the Los Angeles area, using the debit card ending in 2407.  On or about February 2, 2022, another check in the amount of $30,640.50 from a victim company A.B. made out to a victim company B.C. was fraudulently deposited into MUNOZ's account via ATM by coconspirators, including CC-1.  Withdrawals totaling $36,000 in denominations usually ranging between $1,000 and $2,5000 continued from February 2, 2022 through February 16, 2022, the day prior to execution of the warrant. Coconspirators, including CC-1 and CC-2 are visible on ATM footage making withdrawals.

26.  Since the arrest of one of the coconspirators ("CC-1") on February 17, 2022, CC-1 has and continues to be detained pending trial.  In a recorded jail call on or about February 23, 2022, at approximately 12:28 p.m., CC-1 spoke with CC-2 on a recorded prison line.  CC-1 asked "They didn't get nothing at all yesterday? . . . No one has done it at all?"  CC-2 responded "No" to both questions.  CC-1 then asked "What Sabino say?"  CC-2 responded "No, everybody's mad and shit."  CC-1 asked, "Why," to which the caller responded, "I can't tell you why . . . , not over the phone."

27.  Based on my training and experience, I know that fraudsters frequently solicit "clean" bank accounts from third parties that are less likely to be flagged by banks, to deposit stolen or fraudulent checks and withdraw the funds.  In exchange, the fraudsters pay the third-parties a cut of the proceeds for use of their accounts.  Based on the envelops

labeled with MUNOZ's name recovered from the residence, MUNOZ's account activity, and the recorded jail call referencing MUNOZ, there is probable cause that coconspirators utilized MUNOZ's account to deposit fraudulent checks, and that in exchange, MUNOZ was to be paid a portion of the proceeds of the fraud.

## V.  TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

28.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct firearms investigations, I am aware of the following:

a.  Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices, on their person and in backpacks or purses in their vicinity.

b.  Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.    Those who illegally possess firearms often sell their firearms and purchase firearms.   Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.   This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.   In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that they sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d.    d.   Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VI. <u>TRAINING AND EXPERIENCE ON FINANCIAL OFFENSES</u>

29.   Based on my experience and training, and based on my consultation with other law enforcement officers, I know that:

a.    It is common practice for individuals involved in bank fraud and access device fraud crimes to possess and use multiple digital devices at once.   Such digital devices are often used to facilitate, conduct, and track fraudulent transactions.   Suspects often use digital devices to perpetrate

11

their crimes due to the relative anonymity gained by conducting
financial transactions electronically or over the internet.
They often employ digital devices for the purposes, among
others, of: (1) applying online for fraudulent credit cards; (2)
obtaining or storing personal identification information for the
purpose of establishing or modifying fraudulent bank accounts
and/or credit card accounts; (3) using fraudulently obtained
bank accounts and/or credit card accounts to make purchases,
sometimes of further personal information; (4) keeping records
of their crimes; and (5) verifying the status of stolen access
devices.

        b.    Individuals involved in fraud schemes like this
one usually keep evidence of their schemes, such as pay-owe
sheets for dividing the proceeds, contact information for their
co-conspirators, and records documenting the scheme so when an
error is made, they can recreate the documentation needed to
help conceal the fraud.

        c.    Oftentimes mail thieves take pictures of items
retrieved from stolen mail or mail matter with their cellphones.

        d.    Individuals specialized in the fraudulent
negotiation of stolen, altered, or counterfeit checks, will
often maintain a collection of pay stubs corresponding to checks
already negotiated at a financial institution, as well as a
collection of checks yet to be deposited. These checks are
usually drawn off accounts in the name of individuals other than
the perpetrator and can be fraudulently endorsed by the
fraudster through forgery.

e.    These individuals often use the proceeds of the fraud to purchase expensive items, or store the proceeds in the form of cash to make it more difficult to trace.

f.    Based on your affiant's training and experience in the field of fraud investigations, your affiant knows it is common for fraudsters to employ multiple collusive parties to visit multiple Automated Teller Machines ("ATMs") on their behalf.  This adds an additional layer of anonymity to their scheme and helps to avoid detection and identification via video surveillance.

g.    Individuals involved in fraud schemes need to communicate with their co-conspirators about their fraudulent activity.  There are usually records of those communications in their electronic devices such as cellular telephones.

h.    Based on my training and experience, I know that individuals who participate in mail theft, identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business.  Oftentimes, they do so on their digital devices. Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.

i.    Typically, they maintain the evidence where it is close at hand and safe, such as in their residences, vehicles, and digital devices, which are also commonly stored in their

residences and vehicles.  Such individuals commonly use digital devices to communicate with their fellow participants by phone, email, text messages and messaging apps.  I know that individuals who commit crimes with the aid of electronic devices do not readily discard them, as computers, tablets and cell phones are expensive items that are typically used for years before being upgraded or discarded.  Computers, tablets and cell phones can be used to communicate between co-conspirators and may contain information relating to the crime under investigation.

### VII.  **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**[1]

30.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

j.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

14

may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

k.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

l.  The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

m.  Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain

15

"booby traps" that destroy or alter data if certain procedures are not scrupulously followed.   Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

31.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.   Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.   Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.   As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

32.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following,

16

which I know from my training, experience, and review of
publicly available materials:

       a.   Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

       b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

       c.   Thus, the warrant I am applying for would permit
law enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of
the warrant: (1) depress MUNOZ's thumb and/or fingers on the
device(s); and (2) hold the device(s) in front of MUNOZ's face

17

with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

33.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VIII.    CONCLUSION

34.  For all of the reasons described above, there is probable cause to believe that MUNOZ has committed a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the person described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this ~~20th~~ 27th day of
July, 2022.

_____
HONORABLE ALICIA G. ROSENBERG
UNITED STATES MAGISTRATE JUDGE